**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| **MICHAEL EWING,** | ) | |
| **6103 Rosemont Circle** | ) | |
| **North Bethesda, MD 20852** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No.:**_____ |
| | ) | |
| **SOLAR GUYS INC.,** | ) | |
| **SERVE:    ZenBusiness, Registered Agent** | ) | |
| **2008 Bremo Rd., Ste. 110** | ) | |
| **Richmond, Virginia 23226** | ) | |
| | ) | |
| **JORGE RAMOS,** | ) | |
| **SERVE:    11879 Falling Creek Dr.** | ) | |
| **Manassas, Virginia 20112** | ) | |
| | ) | |
| *Defendants.* | ) | |

## COMPLAINT

Plaintiff, Michael Ewing ("**Ewing**" or "**Plaintiff**"), by counsel, states as follows for his Complaint against Defendants, Solar Guys Inc. ("**SGI**") and Jorge Ramos ("**Ramos**") (each a "**Defendant**" and collectively "**Defendants**").

## NATURE OF CASE

1.      SGI is a Virginia-based commercial and utility solar contractor. Since January 2017, and until recently, Ewing was SGI's General Manager and Vice President of Operations, responsible for overseeing all business development, project estimating, contracting, procurement, planning, and operations execution.

2.      By any measure, Ewing contributed enormously to SGI's financial success. In recognition of his then-ongoing and significant contributions to SGI's success, SGI, through its President and Chief Executive Officer, Jorge Ramos provided a compensation structure to Ewing

since January 2019 that included a minimum of 15% of SGI's annual profits paid as a nondiscretionary bonus over and above his annual base salary of $150,000.00 and—as of 2019—15% equity in the company.

3.      Ewing's equity interest was increased by SGI and Ramos to 20% of the proceeds of the sale of SGI as of 2024.

4.      SGI's financial success over the past nine (9) years led to plans to sell SGI to a private equity buyer or other investor group since 2023. And, in view of Ewing's having contributed enormously to SGI's financial success, Ramos made numerous verbal promises to Ewing, which promises were reflected in numerous documents and pitch decks, that Ewing would receive 20% of the proceeds from the sale of SGI.

5.      In late 2025, Ewing raised serious concerns with Ramos and other senior executives of the company regarding the direction of SGI and the conduct and potential misconduct of some other senior employees who were hired by SGI in anticipation of SGI's sale.

6.      In response, rather than addressing the issues raised by Ewing, SGI and Ramos froze Ewing out of his Vice President position, denied that SGI owed Ewing the bonus to which he was entitled (and which SGI had already partially paid), repudiated the promise to pay Ewing 20% of the proceeds of the sale of SGI, and then wrongfully terminated Ewing.

7.      Accordingly, Ewing, by this action, seeks to recover the damages he sustained and to recover all the amounts that he is owed and entitled to recover as a result of SGI's and Ramos' wrongful termination, breach of contract, and other unlawful conduct.

**THE PARTIES**

8.      Michael Ewing is an individual and citizen of the State of Maryland.

9.      SGI is a corporation organized and existing under the laws of the Commonwealth of Virginia with its principal place of business located at 7853 Coppermine Dr , Manassas, VA, 20109. It may be served through its registered agent, ZenBusiness Inc., located at 2008 Bremo Road, Suite 110, Richmond, Virginia 23223.

10.     Jorge Ramos is an individual and citizen of the Commonwealth of Virginia.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because Plaintiff and Defendants are citizens and residents of different States and the amount in controversy exceeds the jurisdictional prerequisite of $75,000.00, exclusive of interest and costs.

12.     This Court has personal jurisdiction over Defendants because Defendants transacted business in this district and Plaintiff's claims arise from those activities.

13.     Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1) and (2) because Defendants are residents of the Commonwealth of Virginia in the Eastern District and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## FACTUAL BACKGROUND

14.     Founded in 2010, SGI is a general contractor that is focused on the construction of commercial and utility solar energy projects in the Northeastern and Mid-Atlantic United States.

15.     On or about January 1, 2017, Ewing joined SGI and initially served as SGI's General Manager, In approximately August 2024, Ewing was promoted to Vice President of Operations, in which role, Ewing was charged with overseeing and managing SGI's operations with respect to solar energy projects from identifying market opportunities and projects to estimating, bidding, and acquisition through to completion.

16.      Since January 2017, Ewing personally negotiated and signed over $100,000,000 in contracts on behalf of SGI with an entirely new customer base resulting in over $40,000,000 in profit to SGI.

17.      Ewing also recruited over a dozen key individuals from his network to bolster SGI's capacity by multiple factors, growing SGI from $3,000,000 revenue to $35,000,000 revenue.

18.      And, even in his final days with SGI, Ewing had negotiated and signed contracts for over $4,000,000 in revenue only days before being constructively discharged from SGI. There were numerous other contract opportunities on the verge of award to SGI and a pipeline of over one billion dollars in live bids for project opportunities.

### Ewing's Compensation and Nondiscretionary Bonus

19.      Ewing's compensation in 2017 and 2018 was $100,000 base salary and a $70,000 performance bonus. Due to SGI's success in 2017 and 2018, Ramos increased Ewing's compensation in January 2019 to include a base salary of $150,000, a minimum of 15% of SGI's annual profits that was paid as a nondiscretionary bonus, and 15% equity in SGI.

20.      Accordingly, in 2019, SGI paid Ewing $365,000 in nondiscretionary bonus. For 2019, the nondiscretionary bonus SGI paid to Mr. Ewing was less than 15% of SGI's gross profit for 2019 by no less than $55,845.

21.      In 2020, SGI paid Ewing $650,000 in nondiscretionary bonus; in 2021, SGI paid Ewing $950,000 in nondiscretionary bonus; in 2022, SGI paid Ewing $950,000 in nondiscretionary bonus; and in 2023, SGI paid Ewing $950,000 in nondiscretionary bonus.

22.      In 2024, SGI paid Ewing a total of $1,400,550 in nondiscretionary bonus. For the 2024 non-discretionary bonus, SGI paid $450,550 in calendar year 2024, $800,000 in January 2025, and $150,000 in February 2025, at Mr. Ewing's request.

23.     In September 2025, Ramos informed Ewing that his earned bonus for the first three quarters of 2025 was at least $900,000, not counting any previously paid bonus or additional bonus to accrue based on gross profit to be realized in the fourth quarter of 2025.

24.     Ewing requested—and SGI voluntarily paid Ewing—$400,000 of the $900,000 nondiscretionary bonus in September 2025. SGI through Ramos advised Ewing that he would be paid the remaining $500,000 upon Ewing's request at any time.

25.     SGI through Ramos further advised Ewing that his nondiscretionary bonus for 2025 would continue to accrue through the end of 2025.

26.     During a meeting with Ramos at SGI's office in Manassas on November 13, 2025, Ewing inquired about the outstanding nondiscretionary bonus payment of $500,000 and additionally accrued bonus based on company profits through the end of 2025.

27.     Although having agreed to pay the remaining $500,000 at any time that Ewing requested it, SGI refused to pay Ewing the previously earned and owed $500,000 in nondiscretionary bonus as demanded on November 13, 2025.

28.     In November 2025, Ramos represented to Ewing that the projected gross profit for SGI in 2025 was at least $13,000,000. Therefore, Ewing's 15% gross profit share for 2025 is no less than $1,950,000.

29.     For 2025, SGI paid Ewing $800,000 in nondiscretionary bonus towards Ewing's total-owed nondiscretionary bonus based on 2025 gross profits. For 2025, the nondiscretionary bonus SGI paid to Mr. Ewing was less than 15% of SGI's gross profit for full year of 2025, by no less than $1,150,000.00.

*Promises to Ewing, Including Promises of Equity Amidst Discussions to Sell SGI*

30.     As a result of SGI's enormous success, SGI began to explore the possibility of selling the company in 2023.

31.     In 2024, Ramos increased Ewing's 15% promised equity by increasing the percentage to 20% that was now to be paid as proceeds of the sales of the company.

32.     In January 2019, during a meeting between Ramos and Ewing at a Starbucks in Gaithersburg, Maryland near the FitzGerald Auto Mall, Ramos made a verbal promise to Ewing that going forward SGI would a) pay Ewing no less than 15% of the annual profits of the company b) at the end of 2019, SGI and Ramos would further compensate Ewing with a 15% ownership interest in SGI.

33.     Ewing relied to his detriment upon this promise by continuing to provide services to SGI.

34.     SGI and Ramos breached this oral agreement at the end of 2019 by failing to pay Ewing at least 15% of the profits and to further not compensating Ewing with a 15% ownership interest in SGI.

35.     In approximately March 2024, SGI through Ramos promised Ewing 20% of the proceeds of the sale of SGI. This promise was documented as part of a Letter of Intent entered into on or about March 22, 2024, between SGI and Directional Services, Inc. (d.b.a. Cinterra) (the "**Cinterra LOI**").

36.      The Cinterra LOI stated that Cinterra was interested in purchasing SGI for aggregate purchase price of up to $40,000,000.

37.     The Cinterra LOI called for Ewing to receive proceeds from the sale of SGI. Of those proceeds, Ewing was expected to roll $1,200,000 of his after-tax proceeds into Cinterra.

38.     The Cinterra LOI called for Ramos to receive proceeds from the sale of SGI. Of

those proceeds, Ramos was expected to roll $4,800,000 of his after-tax proceeds into Cinterra.

39.     The ratio of roll over equity between Ewing and Ramos equated to Ewing's 20% interest in the proceeds of the sale of SGI.

40.     SGI's and Ramos' promises were not contingent on selling SGI to a specific buyer or investor as documented in various letters of intent with potential buyers and/or investors.

41.     SGI and Ramos assured Ewing that he would receive proceeds from sale of SGI on any transaction with any buyer.

42.     As further evidence of SGI's and Ramos' promises, after SGI engaged Deloitte Corporate Finance LLC ("**Deloitte**") to act as SGI's investment banker to assist SGI in finding a different buyer, SGI through Ramos as President relayed these promises and terms to the senior members of the Deloitte team, who then included the promised share of the proceeds in its materials prepared for investors and potential buyers.

43.     And, as part of its efforts to sell the company, SGI assembled various pitch decks, financial projections, and post-acquisition business plans for potential investors reflecting proceeds to be paid to Ewing upon sale of SGI.

44.     SGI's and Ramos' promises were also memorialized in writing in a certain term sheet titled "Term Sheet for Investment in SG Inc." dated July 23, 2025, with Riverbend Energy Transaction, L.L.C. (the "**Term Sheet**") executed by SGI and a representative of Riverbend Energy Transaction, L.L.C. ("**Riverbend**").

45.     The Term Sheet memorialized SGI's promise to have Ewing participate in the proceeds of the sale of SGI to include "approximately $6,355,000 of pre-tax proceeds" from the sale of 70% of the interest in SGI at a valuation of $50,000,000 (equivalent to 12.71% of the proceeds of the sale of 70% of the company).

46.     In addition to the cash proceeds, the Term Sheet called for Ewing to acquire 5.2% of the membership interest in the resulting newly former post-transaction company, referred to as "**SGI NewCo**" or the "Company" in the Term Sheet. Furthermore, in addition to the 5.2% interest, Ewing was to receive additional units in SGI NewCo that would result in a "10% effective equity interest in" SGI NewCo. Finally, the Term Sheet called for Ewing to receive 20% of the "Common D Units" of SGI NewCo, which would entitle him to additional profit interests in SGI NewCo.

47.     In reliance on these promises, Ewing forewent other business opportunities and accepted below market compensation for his work in light of his contributions to SGI's financial success. The promises of SGI and Ramos, as documented, reflected Ewing's substantial contributions to SGI's financial performance and the resulting valuation of SGI.

*Ewing Raises Issues About Senior SGI Employees, SGI Terminates Ewing*

48.     At the urging of SGI's equity investor, Riverbend, SGI hired Franz Szymanski ("**Szymanski**"), in July 2025 as SGI's new Chief Operating Officer ("COO") in the lead up to the proposed sale of SGI to Riverbend.

49.     Over his time with SGI, Szymanski delivered little to no tangible or intangible value to SGI's operations.

50.     Ewing also became aware of concerns about SGI's Chief Financial Officer ("CFO"), Ning Li ("**Li**"), among SGI's project managers and construction managers.

51.     SGI was suffering after the hiring of Szymanski as COO and with Li's actions as CFO. Accordingly, Ewing, as a senior executive, was concerned about these developments and he set out to understand why employees were voicing concern about the direction of SGI.

52.     After checking in with approximately a dozen valued employees of SGI, each of whom reported to him, Ewing found that many of them took issue with Szymanski's approach to

management and some were inclined to leave the company. Most did not know or understand Szymanski's role and raised concerns about his lack of substantive electrical engineering knowledge, lack of responsiveness, frequent absences from the office, and disregard for SGI's historical keys to success.

53.    Ewing also discovered disturbing concerns about Li having artificially inflated project completion percentages and billing clients for work that had not actually been completed. As was his obligation as a senior officer of SGI, Ewing brought these concerns to Ramos' attention in an email dated October 26, 2025, during an in-person meeting held with Ramos and Szymanski on October 27, 2025, and in subsequent communications and meetings with Ramos.

54.    Ramos summarily dismissed Ewing's legitimate concerns. On or about October 26, 2025, Ramos indicated that Ewing should resign if he disagreed with the direction Symanski and Li were taking the company.

55.    On or about October 27, 2025, Ewing followed up on Ramos' request that Ewing resign and Ramos' request that Ewing provide a proposed severance package to account for SGI's and Ramos' promise to Ewing to grant him 20% of the proceeds of the sale of SGI.

56.    After Ewing again raised the legitimate concerns about the efficacy and value of Szymanski's role, especially considering his $262,500 annual base salary plus bonus during a phone call with Ramos on October 30, 2025, Ramos again dismissed these concerns.

57.    Recognizing that Ramos and he were not going to be able to reach an understanding about the issues raised, Ewing inquired of Ramos about severance compensation in view of the promises made to Ewing to share in the proceeds of the sale of SGI. In response, Ramos insisted that Ewing propose a number that would compensate Ewing for the promised equity in SGI.

58.     After Ewing replied that he should receive the promised 20% of the then-current valuation of SGI (which valuation was $50,000,000). In response, Ramos went on an explicative-laden tirade, during which Ramos made threats and generally berated Ewing for simply doing his duty as a senior executive to address operational issues in the best interest of SGI. Ramos further threatened to shut down the company and layoff every employee rather than pay Ewing what he was owed.

59.     In refusing to compensate Ewing with the proceeds of the sale of the company as previously agreed, SGI and Ramos breached the oral agreement between the parties.

60.     Approximately twenty minutes after this call, SGI—at Ramos' direction—abruptly, and without notice, locked Ewing out of SGI's computer systems and Ramos falsely told SGI employees, Deloitte, customers, and other third parties that Ewing had resigned.

61.     On or about the morning of November 5, 2025, Ramos communicated to Ewing that Ewing would not be paid any remaining bonus money for 2025 and that SGI and Ramos would not honor the agreement to provide Ewing 20% of the proceeds of the sale of SGI, stating to Ewing "I have a new offer for you. Are you listening? It's zero."

62.     Subsequently, on or about the evening of November 5, 2025, Ramos stated in a text message that Ramos and SGI would pay Ewing the previously agreed upon 15% share of gross profits for 2025 and pay Ewing 20% of the proceeds of a future sale of SGI.

63.     On the morning of November 6, 2025, Ramos made verbal threats against Ewing if he spoke with any employee or customer to clarify the record of false resignation.

64.     On or about November 6, 2025, Ramos told Ewing that he should leave the company and ordered him to return his laptop and stand down on all work, which actions constructively discharged Ewing.

65.     On November 13, 2025, SGI through Ramos explicitly terminated Ewing in a verbal conversation.

66.     In a letter signed by Ramos and dated December 5, 2025, SGI again purported to terminate Ewing, effective December 5, 2025.

67.     At no time did Ewing resign from SGI.

68.     To date, SGI has not paid and has refused to pay Ewing all sums to which he is entitled, including his earned and due and owing compensation, his earned and due and owing bonus, and the value of the promised 20% of the proceeds of the sale of the company.

69.     SGI's actions have denied Ewing's right to participation in the proceeds of the sale of SGI, denied him earned compensation and bonus, and punished him for engaging in protected activity.

### COUNT I
(Breach of Oral Contract for Compensation and Bonus by SGI)

70.     Paragraphs 1 through 69 are re-alleged and incorporated by reference as though fully set forth herein.

71.     The parties entered into an oral agreement for Ewing's services in 2019. Under this oral contract, Ewing undertook roles, projects, and management of SGI employees at the director level.

72.     This oral contract required SGI to pay Ewing $150,000 in annual salary plus an annual bonus equal to no less than 15% of the gross annual profits of SGI.

73.     This oral contract also required SGI to compensate Ewing with a 15% equity interest in SGI.

74.     As noted previously, in September 2025, SGI through Ramos, informed Ewing that his nondiscretionary bonus compensation earned to date as of September 2025 was $900,000,

which was in addition to any and all compensation Ewing had received to date in 2025. SGI through Ramos also advised Ewing that additional nondiscretionary bonus compensation would continue to accumulate until the end of 2025.

75.     Ewing requested—and SGI voluntarily paid Ewing—$400,000 of the $900,000 nondiscretionary bonus in September 2025. SGI through Ramos advised Ewing that he would be paid the remaining $500,000 upon Ewing's request at any time.

76.     During a meeting with Ramos at SGI's office in Manassas on or about November 13, 2025, Ewing inquired about the outstanding nondiscretionary bonus payment of $500,000 plus additional earned bonus accrued for the fourth quarter of 2025. Although having agreed to pay the remaining $500,000 plus additional accrual for the fourth quarter of 2025 at any time that Ewing requested it, SGI and Ramos breached their oral contact with Ewing by refusing to pay Ewing the previously earned and owed $500,000 plus additional accrual for the fourth quarter of 2025 in nondiscretionary bonus as demanded on or about November 13, 2025.

77.     On or about November 13, 2025, Ramos represented to Ewing that the projected gross profit for SGI in 2025 was at least $13,000,000.00.

78.     In 2025, SGI paid Ewing a total of $800,000 in nondiscretionary bonus towards Ewing's total-owed nondiscretionary bonus based on 2025 gross profits. For 2025, the nondiscretionary bonus SGI paid to Mr. Ewing was less than 15% of SGI's gross profit for full year of 2025 by no less than $1,150,000.

79.     By failing to pay Ewing his nondiscretionary bonus, SGI and Ramos have breached their agreement with Ewing, and as the direct, natural and proximate result of that breach, Ewing has incurred damages in the amount of no less than $1,150,000, plus interest from December 31, 2025.

## COUNT II
### (Breach of Oral Contract for Interest in SGI by SGI and Ramos)

80.     Paragraphs 1 through 79 are re-alleged and incorporated by reference as though fully set forth herein.

81.     The parties entered into an oral agreement for Ewing's services. Under this oral contract, Ewing undertook roles, projects, and management of SGI employees at the director level.

82.     In exchange, SGI and Ramos promised Ewing that his work would be compensated through equity in SGI and participation in the proceeds at the time of any sale. SGI through Ramos made verbal promises to Ewing, upon which he relied to his detriment, that he would receive up to 20% of the proceeds from the sale of SGI or a portion of the company.

83.     As noted previously, this oral contract was reflected in SGI pitch decks, financial projections, and post-acquisition business plans for potential investors reflecting proceeds to be paid to Ewing upon sale of SGI.

84.     In addition, as noted previously, SGI's and Ramos' promises were also memorialized in writing in the Term Sheet with Riverbend. The Term Sheet memorialized SGI's promise to have Ewing participate in the proceeds of the sale of SGI to include "approximately $6,355,000 of pre-tax proceeds" from the sale of 70% of the interest in SGI at a valuation of $50,000,000 (equivalent to 12.71% of the proceeds of the sale of 70% of the company).

85.     In addition to the cash proceeds, the Term Sheet called for Ewing to acquire 5.2% of the membership interest in the resulting newly former post-transaction company, referred to as "SGI NewCo" or the "Company" in the Term Sheet. Furthermore, in addition to the 5.2% interest, Ewing was to receive additional units in SGI NewCo that would result in a "10% effective equity interest in" SGI NewCo. Finally, the Term Sheet called for Ewing to receive 20% of the "Common D Units" of SGI NewCo, which would entitle him additional profit interests in SGI NewCo.

86.     Ewing relied on this oral contract to his detriment by accepting below-market compensation from SGI and turning down other more lucrative professional opportunities. By failing to pay Ewing for his services, repudiating his equity interest in SGI, and denying him participation in the proceeds of the sale of the company, SGI and Ramos have breached their agreement with Ewing, and as the direct, natural and proximate result of that breach, Ewing has incurred damages in an amount to be determined at trial, but no less than 20% of the value of SGI, which based on its most recent valuation of $50,000,000, amounts to $10,000,000 in damages.

## COUNT III
(Breach of Implied Contract by SGI and Ramos)

87.     Paragraphs 1 through 86 are re-alleged and incorporated by reference as though fully set forth herein.

88.     Despite Ewing's integral role in SGI's success, SGI never provided Ewing with an express written contract.

89.     As part of SGI's leadership team, Ewing undertook roles, projects, and management of SGI employees at the director level.

90.     Although working without an express written contract, Ewing expected, received, and was reassured his work would be compensated through nondiscretionary bonuses, equity interest in SGI, and participation in the proceeds at the time of any sale of SGI.

91.     SGI and Ramos promised to pay Ewing a minimum of 15% of annual profits and 20% of proceeds from sale of SGI.

92.     On multiple occasions, including in previously executed letters of intent with others, SGI through Ramos committed to Ewing that he would be awarded 20% of the proceeds of the sale of SGI.

93.     SGI through Ramos' words and actions as recounted herein and as memorialized in the Riverbend Term Sheet had an implied contract that granted Ewing the right to participate in the proceeds of the sale of SGI in consideration for his contributions to SGI's financial success over nine years.

94.     Ewing relied on this implied contract to his detriment by accepting below-market compensation from SGI and turning down other more lucrative professional opportunities.

95.     Ewing performed his duties to SGI in good faith throughout his employment with SGI.

96.     In terminating Ewing without cause and without recourse or compensation for his interest in the proceeds of the sale of SGI, SGI and Ramos breached the implied contract, thereby causing Ewing to suffer damages of an amount to be determined at trial, but no less than 20% of the value of SGI, which based on its most recent valuation of $50,000,000, amounts to $10,000,000 in damages.

## COUNT IV
(Actual Fraud by Defendants as to Nondiscretionary Bonus)

97.     Paragraphs 1 through 96 are re-alleged and incorporated by reference as though fully set forth herein.

98.     As noted previously, in September 2025, SGI and Ramos made false statements to Ewing that SGI would pay Ewing $500,000 of his 2025 nondiscretionary bonus when he requested payment. These statements were made intentionally and knowingly with the intent to mislead Ewing to continue his employment with SGI.

99.     Ewing relied on these representations to his detriment in continuing to perform work at SGI and forgo other business opportunities. Ewing has been damaged in an amount no less than $1,150,000 by SGI's and Ramos' actions.

## COUNT V
### (Actual Fraud by Defendants as to Equity Interest in SGI)

100.    Paragraphs 1 through 99 are re-alleged and incorporated by reference as though fully set forth herein.

101.    As noted previously, on multiple occasions, SGI and Ramos made false statements to Ewing that Ewing would be compensated through equity in SGI and participation in the proceeds at the time of any sale.

102.    On multiple occasions, SGI and Ramos promised to pay Ewing a minimum of 15% of annual profits and 20% of the proceeds of the sale of SGI. On multiple occasions, including in previously executed letters of intent with others, SGI through Ramos committed to Ewing that he would participate in the proceeds of the sale of SGI.

103.    Ewing relied on these representations to his detriment in continuing to perform work at SGI and forgo other business opportunities. Ewing has been damaged in an amount no less than $10,000,000 by SGI's and Ramos' actions.

## COUNT VI
### (Constructive Fraud by Defendants as to Nondiscretionary Bonus)

104.    Paragraphs 1 through 103 are re-alleged and incorporated by reference as though fully set forth herein.

105.    As noted previously, in September 2025, SGI and Ramos negligently or intentionally made false statements to Ewing that SGI would pay Ewing $500,000 of his 2025 nondiscretionary bonus when he requested payment.

106.    Ewing relied on these representations to his detriment in continuing to perform work at SGI and forgo other business opportunities. Ewing has been damaged in an amount no less than $1,150,000 by SGI's and Ramos' actions.

## COUNT VII
(Constructive Fraud by Defendants as to Equity Interest in SGI)

107.    Paragraphs 1 through 106 are re-alleged and incorporated by reference as though fully set forth herein.

108.    As noted previously, on multiple occasions, SGI and Ramos negligently or innocently made false statements to Ewing that Ewing would be compensated through equity in SGI and participation in the proceeds at the time of any sale of the company.

109.    On multiple occasions, SGI and Ramos promised to pay Ewing a minimum of 15% of annual profits and 20% of the proceeds of the sale of SGI. On multiple occasions, including in previously executed letters of intent with others, SGI through Ramos committed to Ewing that he would participate in the proceeds of the sale of SGI.

110.    Ewing relied on these representations to his detriment in continuing to perform work at SGI and forgo other business opportunities. Ewing has been damaged in an amount no less than $10,000,000 by SGI's and Ramos' actions.

## COUNT VIII
(Wrongful Termination/Retaliatory Discharge by SGI)

111.    Paragraphs 1 through 110 are re-alleged and incorporated by reference as though fully set forth herein.

112.    Ewing was an at-will employee, and his termination arose from his raising concerns over potentially illegal billing practices of Li in violation of established Virginia public policy against fraud.

113.    Ewing's termination after raising concerns regarding, among other things, Li's routine practice of inflating project completion percentages and overbilling clients at the Sun Ridge Project and other projects constitutes wrongful termination for protected activity.

114.    Ramos further falsely informed third parties that Ewing has resigned from the company and provided other false information to third parties regarding the reason for Ewing's wrongful termination, thereby causing Ewing reputational harm with potential future employers and business partners.

115.    As result of his wrongful termination, Ewing is entitled to lost pay and benefits in the amount of no less than $1,150,000.

116.    In addition, as a result of his wrongful termination, Ewing has suffered reputational harm in an amount to be proven at trial, but not less than $500,000.

### COUNT IX
(Alternative Claim of Quantum Meruit against SGI and Ramos)

117.    Paragraphs 1 through 116 are re-alleged and incorporated by reference as though fully set forth herein.

118.    Alternatively, if no express or implied contract is found, Ewing provided valuable services to Defendants at their request and direction.

119.    Ewing built a pipeline of project opportunities at SGI prior to his wrongful termination of over $1 billion dollars of potential revenue that SGI will retain, and a portion of which revenue SGI reasonably expected to pay to Ewing.

120.    Furthermore, in role as President and CEO of SGI, Ramos promised Ewing 20% of the proceeds of the sale of SGI. Based on the most recent independent valuation of SGI of $50,000,000, that interest is equivalent to $10,000,000.

121.    As a result of the above, Ewing should be awarded damages amounting to the reasonable value of the work performed in the amount of no less than $10,000,000.

## COUNT X
### (Alternative Claim of Unjust Enrichment against SGI and Ramos)

122.     Paragraphs 1 through 121 are re-alleged and incorporated by reference as though fully set forth herein.

123.     Ewing's executive-level work as part of SGI's leadership team conferred significant benefit to SGI but was historically undervalued and Ewing's services remain uncompensated fully.

124.     Ewing provided valuable services to SGI at SGI's request and direction, of which valuable services SGI and Ramos knew and should reasonably have expected to repay Ewing. Indeed, in recognition of Ewing's value and service, SGI and Ramos agreed that Ewing would be entitled to equity in SGI and to participate in the proceeds of the sale.

125.     SGI and Ramos agreed that reasonable compensation for Ewing's work required payment of his equity value.

126.     Furthermore, in his role as President and CEO of SGI, Ramos promised Ewing a 20% of the proceeds of the sale of SGI. Based on the most recent independent valuation of SGI of $50,000,000, that interest is equivalent to $10,000,000.

127.     SGI's and Ramos' decision to terminate Ewing's employment without compensation for his interest in SGI deprives him of the equity and overall compensation he is owed, which benefit SGI and Ramos did not pay, retained, and therefore were unjustly enriched.

128.     Furthermore, at SGI's and Ramos' direction and with SGI's and Ramos' knowledge, Ewing built a pipeline of projects at SGI prior to his wrongful termination of over $1 billion dollars of potential revenue that SGI will retain, and a portion of which revenue SGI reasonably expected to pay to Ewing.

129.     Ewing reasonably anticipated to be compensated for his efforts in generating these business opportunities, but SGI's and Ramos' termination of Ewing, while retaining these

opportunities, has denied him his right to compensation in the amount to be determined at trial but not less than $9,000,000 which SGI and Ramos have not paid, retain, and unjustly enriches SGI and Ramos.

130.    As a result, of the above, SGI and Ramos have been unjustly enriched in the amount of $9,000,000.

## COUNT XI
(Unpaid Wages – Va. Code § 40.1-29 against SGI)

131.    Paragraphs 1 through 130 are re-alleged and incorporated by reference as though fully set forth herein.

132.    Ewing's compensation since 2019 includes a minimum of 15% of SGI's annual gross profits that was to be paid as a nondiscretionary bonus over and above his annual base salary of $150,000, of which wage obligation SGI was and is aware.

133.    Though SGI paid Ewing $800,000.00 in nondiscretionary bonus in 2025, SGI has failed to pay no less than $1,150,000 wages, despite demand for the same on November 13, 2025, which amount is due and owing.

134.    The total amount of nondiscretionary bonus—constituting wages—to which Ewing is entitled continues to accrue through the end of 2025, the amount of which will be determined at trial but is estimated at $1,150,000.

135.    In addition, pursuant to Virginia Code § 40.1-29(J), because of SGI knowingly refused to pay the nondiscretionary bonus amounts to which Ewing is entitled, Ewing is entitled to recover the amounts owed, plus an amount equal to triple the amount of wages due, plus interest at 8% accruing from the date the wages were due, plus Ewing's reasonable attorneys and costs.

136.    Accordingly, Ewing has suffered damages for the unpaid nondiscretionary bonus that SGI knowingly has not paid in the amount of at least $1,150,000 for 2025, plus 8% interest

from the date of his wrongful termination, plus attorney's fees and costs, which said fees and costs have not yet been determined, but is not expected to be less than $150,000.

137.     Furthermore, Ewing is entitled to treble damages, interest, and attorney's fees and costs for the above unpaid wages that SGI knowingly has not paid.

## COUNT XII
(Piercing the Corporate Veil/Alter Ego Liability)

138.     Paragraphs 1 through 137 are re-alleged and incorporated by reference as though fully set forth herein.

139.     Upon information and belief, Ramos exercised complete dominion and control over SGI with respect to the transactions and conduct alleged herein, such that the separate personalities of the corporation and Ramos no longer existed.

140.     Ramos used such control to commit a fraud, wrong, or other unjust act against Ewing, including but not limited to (1) failing to observe corporate formalities; and (2) diverting corporate assets or opportunities for personal use and benefit.

141.     As a direct and proximate result of the foregoing, adherence to the fiction of the separate corporate existence would sanction fraud or promote injustice. Wherefore, Ewing respectfully requests that the Court disregard the corporate entity of SGI, hold Ramos personally liable for the obligations owed to Ewing, and grant such other and further relief as the Court deems just and proper.

## RELIEF REQUESTED

WHEREFORE, Michael Ewing, by counsel, requests the following relief:

(a)     That Michael Ewing have and recover all damages on COUNT I and judgment in his favor in an amount to be proven at trial, but at least $1,150,000 plus interest from December 31, 2025;

(b)    That Michael Ewing have and recover all damages in COUNT II and judgment in his favor in an amount to be proven at trial, but at least $10,000,000;

(c)    That Michael Ewing have and recover all damages in COUNT III and judgment in his favor in an amount to be proven at trial, but no less than $10,000,000;

(d)    That Michael Ewing have and recover all damages in COUNT IV and judgment in his favor in an amount to be proven at trial, but no less than $1,150,000;

(e)    That Michael Ewing have and recover all damages in COUNT V and judgment in his favor in an amount to be proven at trial, but no less than $10,000,000;

(f)    That Michael Ewing have and recover all damages in COUNT VI and judgment in his favor in an amount to be proven at trial, but no less than $1,150,000;

(g)    That Michael Ewing have and recover all damages in COUNT VII and judgment in his favor in an amount to be proven at trial, but no less than $10,000,000;

(h)    That Michael Ewing have and recover all damages in COUNT VIII and judgment in his favor in an amount to be proven at trial, but no less than $1,650,000;

(i)    That Michael Ewing have and recover all damages in COUNT IX and judgment in his favor in an amount to be proven at trial, but no less than $10,000,000;

(j)    That Michael Ewing have and recover all damages in COUNT X and judgment in his favor in an amount to be proven at trial, but no less than $9,000,000;

(k)    That Michael Ewing have and recover all damages in COUNT XI and judgment in his favor in an amount to be proven at trial, but no less than treble damages on a base amount of $1,150,000 plus interest from December 31, 2025, pursuant to Virginia Code § 40.1-29(J).

(l)    That Michael Ewing have and recover pursuant to Virginia Code § 40.1-29(J) and judgment in his favor for his reasonable attorney's fees, costs, and statutory interest;

(m)     That the Court disregard the corporate entity of SGI and hold Ramos personally liable for the obligations owed to Michael Ewing;

(n)     That Michael Ewing have and recover and judgment in his favor for pre-and post-judgment interest, as well as costs; and

(o)     That the Court enter such and further relief as it deems proper and just.

## JURY DEMAND

Michael Ewing demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: February 2, 2025                         Respectfully Submitted,

                                                **MICHAEL EWING**


                                                By: */s/ Robert H. Cox*_____
                                                            Counsel

                                                Robert H. Cox, Esquire (VSB No. 33118)
                                                Peter N.Y. Zuk, Esquire (VSB No. 92627)
                                                WHITEFORD, TAYLOR & PRESTON, L.L.P.
                                                3190 Fairview Park Drive, Suite 800
                                                Falls Church, Virginia 22042
                                                Telephone:      (703) 652.1035
                                                Facsimile:      (703) 259-6526
                                                E-mail:      rcox@whitefordlaw.com
                                                E-mail:      pzuk@whitefordlaw.com


                                                Robert Wm. Best, Esquire (VSB No. 72077)
                                                WHITEFORD, TAYLOR & PRESTON, L.L.P.
                                                249 Central Park Avenue, Suite 300-91
                                                Virginia Beach, Virginia 23462
                                                Telephone:      (757) 271.9752
                                                Facsimile:      (757) 271.9737
                                                E-Mail:      rbest@whitefordlaw.com


                                                Christopher M. Chassion, Esquire (*Pro Hac Vice Application Forthcoming*)

WHITEFORD, TAYLOR & PRESTON, L.L.P.
1800 M Street, NW, Ste. 450N
Washington, DC 20036-5869
Telephone:       (202) 836-8485
Facsimile:       (202) 327-6174
E-mail:          cchaisson@whitefordlaw.com

*Counsel for Plaintiff Michael Ewing*